**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOSEPH J. WILLIAMS and SANDRA L. WILLIAMS,** : | |
| : | |
| **Plaintiffs** | **CIVIL ACTION NO. 3:14-1876** |
| : | |
| **v.** | |
| : | **(JUDGE MANNION)** |
| **PROGRESSIVE NORTHERN INSURANCE COMPANY,** : | |
| **Defendant** : | |

## MEMORANDUM

Pending before the court is the defendant's motion for partial summary judgment. (Doc. 11). Upon review, the defendant's motion will be granted.

By way of relevant background, the plaintiffs filed the instant action in the Court of Common Pleas of Wayne County on August 27, 2014. On September 26, 2014, the defendant timely removed the action to this court based upon diversity jurisdiction. (Doc. 1). An answer to the complaint was filed on October 3, 2014. (Doc. 4).

On May 1, 2015, the defendant filed the instant motion for partial summary judgment, (Doc. 11), along with a statement of material facts with supporting exhibits, (Doc. 12), and a supporting brief, (Doc. 13). The plaintiffs filed a brief in opposition to the defendant's motion for partial summary judgment on May 29, 2015. (Doc. 14). On June 12, 2015, the defendant filed a reply brief. (Doc. 15).

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Casualty & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249 ; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (holding that a court may not weigh the evidence or make credibility determinations). The court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party

can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

In its motion, the defendant seeks summary judgment only as to the bad faith claim raised in the plaintiffs' complaint.[1] In support of its motion, the defendant has submitted a statement of material facts with supporting exhibits. (Doc. 12). The plaintiffs have failed to respond to the defendant's statement

---

[1] The plaintiffs also have a claim for underinsured motorist coverage on behalf of Mr. Williams and a loss of consortium claim on behalf of Mrs. Williams.

3

of material facts. "The Middle District of Pennsylvania's Local Rules require a party seeking summary judgment to file 'a separate, short and concise statement of material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.'" Thomas v. Lawler, 2015 WL 5567921 (quoting Pa. M.D. L.R. 56.1). Local Rule 56.1 also provides that the non-moving party shall provide "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party], as to which it is contended that there exists a genuine issue to be tried." "All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party." Pa. M.D. L.R. 56.1; see also Fed.R.Civ.P. 56(e)(2) (if a party fails to properly support an assertion of fact, or address an another party's assertion of fact, the court may consider the fact undisputed for the purposes of the motion). "[T]he purpose of the factual statements required by Local Rule 56.1 is not insignificant." Soler v. Fernandez, 2015 WL 5771929 (M.D.Pa. Sept. 29, 2015). Statements required by Local Rule 56.1:

> are not merely superfluous abstracts of the evidence. Rather, they are intended to alert the court to precisely what factual questions are in dispute and point the court to the specific evidence in the record that supports a party's position on each of these questions. They are, in short, roadmaps, and without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own.

4

Id. at *7 (quoting Loften v. Diolosa, 2014 WL 981596 (M.D.Pa., March 13, 2014) (citations omitted)). Consequently, to the extent they are supported by the record evidence, the facts set forth by the defendant in support of its motion for partial summary judgment are deemed admitted.

The defendant's statement of material facts establishes that the plaintiff, Joseph Williams, ("Mr. Williams"), was involved in a motor vehicle accident with another driver, Anthony Yannone, while riding his motorcycle on April 22, 2010. At this time, Mr. Williams was insured pursuant to a motorcycle insurance policy, ("Policy"), issued by the defendant, which provides up to $100,000 in underinsured motorist, ("UIM"), coverage, per person, stacked with two motorcycles on the Policy for a total of $200,000 in UIM coverage, subject to the terms and conditions of the policy.

The Policy provides, in relevant part:

**INSURING AGREEMENT - UNDERINSURED MOTORIST COVERAGE**
If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the **owner** or operator of an **underinsured motor vehicle** because of **bodily injury**:

1) sustained by an **insured person**;
2) caused by an **accident**; and
3) arising out the ownership, maintenance or use of an **underinsured motor vehicle**.

(Doc. 12, Ex. A, emphasis in original).

Further, the Policy defines an "underinsured motor vehicle" as:

5

> **"Underinsured motor vehicle"** means a land motor vehicle or trailer of any type to which a bodily injury liability bond or policy applies at the time of the **accident**, but the sum of all applicable limits of liability for **bodily injury** is less than the damages which an **insured person** is entitled to recover from the owner or operator of the motor vehicle because of **bodily injury**.

(Id.).

The defendant opened a UIM claim on Mr. Williams's behalf on April 29, 2010, and assigned the claim to Jennifer Kislowski. As Mr. Williams already retained counsel by the time the UIM claim was opened, he never had any direct communications, written or otherwise, with the defendant regarding his UIM claim.

On May 10, 2010, May 11, 2010, and May 17, 2010, Ms. Kislowski called Mr. Williams's counsel and left messages requesting contact to discuss Mr. Williams's UIM claim. Ms. Kislowski again called Mr. Williams's counsel on June 3, 2010, and spoke with an assistant, who stated that counsel would be sending the defendant a letter of representation. A letter of representation was sent that afternoon. There is no indication from the record that information relating to the UIM claim was provided at that time.

As of August 10, 2010, neither Mr. Williams nor his counsel provided the defendant with documentation relating to the UIM claim. As such, on that day, Ms. Kislowski again called Mr. Williams's counsel to discuss the status of the claim. During this conversation, counsel indicated that Mr. Williams had

asserted a liability claim against Anthony Yannone, but had not yet received any communication from Mr. Yannone's insurers. Counsel further stated that she did not know the amount of the third-party liability insurance coverage which was available to Mr. Yannone. Counsel stated that she would forward Mr. Williams's medical records for evaluation of the UIM claim.

By way of letter dated September 26, 2010, Mr. Williams's counsel provided the defendant with initial medical records, the last of which was dated June 10, 2010. Those records were reviewed by Ms. Kislowski on October 18, 2010, at which time she noted that the records indicated that Mr. Williams had fractured his right knee cap and his left pinky finger. Mr. Williams's right knee cap fracture was treated non-surgically with a brace and the pinky fracture was repaired with the use of pins. The records demonstrated that Mr. Williams was released to full activity on May 27, 2010. As of that date, it was indicated that Mr. Williams had no pain in his knee and that he had a "healed fracture. No need for follow-up." Moreover, it was noted that Mr. Williams's pinky fracture showed "good anatomical alignment and good early bone healing." According to her review of those records, Ms. Kislowski determined that Mr. Williams's out of pocket medical expenses totaled $293.10.

On October 18, 2010, Ms. Kislowski called Mr. Williams's counsel to discuss the status of the UIM claim. Also on that date, Ms. Kislowski inquired by way of letter as to whether Mr. Williams's medical treatment was ongoing

7

and whether there were additional medical records for her review. Ms. Kislowski requested that Mr. Williams's counsel provide information regarding any lost wages that Mr. Williams had incurred as a result of the accident and to provide confirmation of the amount of Mr. Yannone's liability insurance coverage.

By way of letter dated November 30, 2010, counsel sent the defendant a "wage verification" from Mr. Williams's employer which indicated that Mr. Williams had returned to work on June 28, 2010, with a total wage loss of $8,016.

On January 10, 2011, counsel wrote a letter to the defendant and demanded the defendant's policy limits. However, as of that date, counsel had not provided the defendant with information regarding whether Mr. Williams had undergone any medical treatment since June 11, 2010. Counsel had also not provided the defendant with information regarding the amount of liability insurance coverage which was available to Mr. Yannone, so that the defendant could evaluate whether Mr. Yannone was even underinsured. As a result of the January 10, 2011, letter, on January 13, 2011, the defendant retained the law firm of Forry Ullman, P.C., to assist with its investigation of Mr. Williams's UIM claim.

On January 21, 2011, Ms. Kislowski called Mr. Williams's counsel, who informed Ms. Kislowski that Mr. Yannone's insurance companies had verbally

informed counsel that there was a total of $65,000 in liability coverage available to Mr. Yannone. Given this, Mr. Williams would not be entitled to UIM benefits unless his damages exceeded $65,000. Mr. Williams's counsel indicated that she would provide written confirmation of Mr. Yannone's insurance coverage to the defendant when she received it.

On February 11, 2011, the defendant's counsel wrote to Mr. Williams's counsel to confirm the medical records that were in the defendant's possession and to inquire as to whether there were any additional or updated records for the defendant to review. On March 22, 2011, the defendant's counsel followed up by sending authorizations for medical records to Mr. Williams's counsel for Mr. Williams's signature.

On May 6, 2011, Mr. Williams's counsel wrote to defendant that Mr. Williams and Mr. Yannone had agreed to settle the third-party liability claim and requested the defendant's consent to the settlement. The defendant, in turn, waived its right to subrogation and consented to the settlement by way of letter dated June 29, 2011. In that same letter, Ms. Kislowski requested that Mr. Williams's counsel provide a "complete settlement package at your earliest convenience so I can move forward with my evaluation of the UIM claim being presented."

On October 4, 2011, Brett Katz wrote to Mr. Williams's counsel to inform her that he had been assigned to handle the plaintiff's UIM claim. In advance

of a statement under oath, Mr. Katz reviewed Mr. Williams's file and called his counsel on January 10, 12, 16, 20 and 23, 2012, to determine whether there was any potential for settlement.

On January 26, 2012, Mr. Williams's counsel called Mr. Katz and demanded $125,000 to settle the UIM claim. During this call, Mr. Williams's counsel stated that Mr. Williams had additional medical treatment for which records had not been provided to the defendant. Mr. Katz indicated to counsel that, based on the information the defendant had received, it would offer $1,500 to resolve the UIM claim. Mr. Katz and counsel agreed to proceed with the statement under oath so that the defendant could obtain an accurate understanding of Mr. Williams's residuals.

Mr. Williams's statement under oath took place on January 31, 2012. Mr. Katz was in attendance and entered a detailed summary of the statement in the defendant's claim notes. During the statement under oath, Mr. Williams and his counsel identified medical providers whose medical records had not been previously provided to the defendant. In addition, Mr. Williams indicated that he did not have any wage loss other than the amount which was reported in November 2010, he had not missed any promotion opportunities, and he had, in fact, received raises since the time of the accident.

On March 19, 2012, the defendant's counsel sent Mr. Williams's counsel authorizations for the defendant to obtain medical records from the providers

that had been identified during the statement under oath. These authorizations were executed and returned to the defendant in April 2012.

On April 16, 2012, the defendant's counsel sent the executed authorizations to Mr. Williams's medical providers and to Mr. Yannone's insurer to obtain medical records and information that had been developing during the third-party lawsuit. The defendant followed up to obtain medical records in May, June, and September 2012. Mr. Katz reviewed the medical records on October 12, 2012, after which he determined that Mr. Williams had last treated for his injuries in August 2011.

On October 18, 2012, Mr. Katz called Mr. Williams's counsel and told counsel that he was evaluating the UIM claim and wanted to confirm the amount of the demand. Mr. Katz and counsel discussed the sporadic nature of Mr. Williams's treatment in 2011 and that he had apparently not been treated at all in 2012. Mr. Williams's counsel indicated that she would review the file and get back to the defendant with a demand.

When he did not hear from Mr. Williams's counsel, Mr. Katz called counsel on December 14, 2012, and left a message indicating that the defendant would like to resolve the claim. Voicemails were exchanged between Mr. Katz and counsel on December 19, 2012. On December 21, 2012, January 2, 2013, January 4, 2013, January 7, 2013, and January 14, 2013, Mr. Katz called Mr. Williams's counsel and left messages to discuss

settlement.

On January 21, 2013, Mr. Katz again called Mr. Williams's counsel. At this time, Mr. Katz spoke with counsel and informed her that he had evaluated the UIM claim based upon Mr. Williams's statement under oath and the defendant's receipt of medical records. Mr. Katz offered $15,017 on the defendant's behalf to settle the claim. Considering the $65,000 underlying liability limit, this offer placed an evaluation on the claim in excess of $80,000. At this time, Mr. Williams's counsel indicated that she had received additional medical records, but that she had not yet reviewed them or sent them to the defendant. She indicated that she would review the records, contact Mr. Williams about the settlement offer, and then provide the defendant with a response. The defendant's offer was confirmed by way of correspondence dated January 21, 2013.

Mr. Williams's counsel was called on February 4, 2013, February 18, 2013, March 6, 2013, and March 26, 2013 to follow up on the settlement offer with no response. On March 27, 2013, a paralegal from Mr. Williams's counsel's office contacted Mr. Katz indicating that the settlement offer was still being considered. Mr. Katz again spoke with the paralegal on April 12, 2013, at which time the paralegal indicated that she was not sure what was going on with the offer or whether it was even extended to Mr. Williams. The paralegal indicated that she would discuss the matter with counsel and call back.

On April 25, 2013, Mr. Katz called Mr. Williams's counsel, but did not receive a return call. On April 30, 2013, the defendant's counsel wrote Mr. Williams's counsel requesting that she contact the defendant to discuss Mr. Williams's response to the settlement offer. On May 8, 2013, Mr. Katz again called counsel, but did not receive a return call.

By way of correspondence dated May 20, 2013, Mr. Williams's counsel demanded $300,000 ($100,000 more than the available UIM coverage) to settle the claim. Counsel's correspondence indicated that Mr. Williams continued to undergo medical treatment, but did not identify any medical providers with whom Mr. Williams was treating. Further, no medical records were enclosed with the correspondence. As of this date, the most recent medical records in the defendant's possession were dated August 2011.

In light of the demand, the defendant followed-up to obtain additional medical records. To this extent, on or about May 28, 2013, Mr. Katz received and reviewed chiropractic records which showed that Mr. Williams had three chiropractic treatments between February 2012 and May 9, 2012 for neck and back complaints. The records further indicated that Mr. Williams had chiropractic treatments for his neck and back prior to the motorcycle accident at issue.

On May 29, 2013, the defendant's counsel wrote to Mr. Williams's counsel to clarify that the Policy provided $200,000 in UIM coverage, not the

$300,000 demanded. The defendant's counsel requested that updated medical records, if any, be provided or that Mr. Williams's medical providers be identified.

On June 3, 2013, Mr. Williams's counsel wrote the defendant's counsel to confirm that her May 20, 2013, letter was incorrect regarding the Policy's limits. Counsel again stated that Mr. Williams was following up with medical providers, but did not provide any updated medical records or identify the medical providers. Counsel indicated that she would provide records upon receipt of same.

On July 16, 2013, Mr. Williams underwent an independent medical examination with Eugene D. Kim, M.D. At the time of the examination, Mr. Williams indicated that he was not undergoing any treatment for his right knee or left hand injuries. Upon examination, Mr. Williams was noted to have sustained a left fifth metacarpal fracture, right patella fracture, and a concussion as a result of the accident. Both fractures were noted to have healed anatomically. Dr. Kim indicated that Mr. Williams was not disabled as a result of the accident and, in fact, was employed at his previous job without restrictions. Mr. Williams's prognosis was noted to be excellent and it was noted that he would not require any limitations or restrictions. Dr. Kim's report was forwarded to Mr. Williams's counsel by the defendant's counsel by way of correspondence dated July 30, 2013.

Mr. Katz attempted to follow up with Mr. Williams's counsel on August 8, 2013, August 28, 2013, September 18, 2013, October 23, 2013, and November 12, 2013 with no success. In addition, the defendant's counsel wrote Mr. Williams's counsel on October 1, 2013, and requested contact to discuss the claim and to obtain any additional information for the defendant's evaluation of the claim.

Mr. Katz called Mr. Williams's counsel on December 9, 2013, after which he noted that counsel indicated that she would contact Mr. Williams to get an update regarding his residuals/activities of daily living and to discuss a demand. She indicated that she would call the defendant when this was completed. Mr. Katz followed up with counsel on December 23, 2013, at which time, counsel indicated that she had not yet had the opportunity to speak with the plaintiff.

Mr. Katz called Mr. Williams's counsel on January 13, 2014, February 20, 2014, March 19, 2014, April 22, 2014, May 15, 2014, June 5, 2014, and June 26, 2014, but received no return call. The defendant's counsel called Mr. Williams's counsel on July 2, 2014 and requested a return call to discuss the claim and to obtain any additional information for the defendant's evaluation.

Mr. Katz again called Mr. Williams's counsel on July 16, 2014. During this call, counsel stated that she had obtained a letter from a co-worker of Mr. Williams stating that his demeanor had changed since the accident. Counsel

indicated that she wanted to contact Mr. Williams to see if he was having any concussion-like symptoms or headaches and, if so, inform him that he may need to go for a neuropsychological consultation. Mr. Katz and counsel both indicated that they would like to resolve the matter and counsel indicated that she anticipated a reduction in demand.

On July 23, 2014, Mr. Williams's counsel provided the previously discussed letter from his co-worker. This letter was not dated and was written in the past tense. Counsel did not give any indication that Mr. Williams had undergone a neuropsychological consultation, nor did she provide the defendant with a demand. Instead, counsel served a writ of summons upon the defendant on August 12, 2014, and filed the instant complaint on August 27, 2014.

Based upon the above facts, the defendant argues in its partial motion for summary judgment that the plaintiffs have failed to adequately establish a claim of bad faith pursuant to Pennsylvania's insurance bad faith statute.

Pennsylvania's insurance bad faith statue provides:

[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%; (2) Award punitive damages against the insurer; (3) Assess court costs and attorney fees against the insurer.

[42 Pa.C.S.A. §8371](42 Pa.C.S.A. §8371).

In order to satisfy the requirements of §8371, the insured must demonstrate that the insurer (1) "lacked a reasonable basis for denying benefits;" and (2) "knew or recklessly disregarded its lack of reasonable basis." Klinger v. State Farm Mut. Auto. Ins. Co., 115 F.3d 230, 233 (3d Cir.1997) (citing Terletsky v. Prudential Prop. and Cas. Co., 649 A.2d 680, 688 (Pa.Super.Ct.1994)). Claims of bad faith are fact specific and depend on the conduct of the insurer toward its insured. Condio v. Erie Ins. Exch., 899 A.2d 1136, 1143 (Pa.Super.Ct. 2006). An insured must meet the heightened standard of clear and convincing evidence to establish a claim of bad faith. Smith v. State Farm Mut. Auto. Ins. Co., 2012 WL 508445, at *3 (E.D.Pa. Feb.16, 2012). This standard requires the insured to "provide evidence 'so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith.'" Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 179 (3d Cir. 2011) (quoting Bostick v. ITT Hartford Grp., 56 F.Supp.2d 580, 587 (E.D.Pa. 1999)).

Pennsylvania's insurance bad faith statute does not explicitly define bad faith; however, the Court of Appeals for the Third Circuit has found that for purposes of §8371, "bad faith" is:

> any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive

of self-interest or ill will; mere negligence or bad judgment is not bad faith.

Keefe v. Prudential Prop. and Cas. Ins. Co., 203 F.3d 218, 225 (3d Cir. 2000) (citing Terletsky, 649 A.2d at 688). Some examples of bad faith are a frivolous or unfounded refusal to pay, failure to investigate the facts, failure to communicate with the insured, failure to engage in settlement negotiations, and unreasonable delay. See Katta v. Geico Ins. Co., 2013, WL 275529, *7 (W.D.Pa. Jan. 24, 2013) (citations omitted). While the insurer's duty of good faith and fair dealing does not allow it to protect its own interests at the expense of its insured's, an insurer also need not "submerge its own interests in favor of those of its insured, and investigating and litigating a claim does not constitute bad faith." Id.

Here, the plaintiffs have failed to establish by clear and convincing evidence that the defendant acted in bad faith with respect to the handling of Mr. Williams's UIM claim. Instead, from the record before the court, it appears that the defendant was reasonably attempting to gather all of the information necessary to properly evaluate the claim.

The record demonstrates that Mr. Williams's chief complaints after the accident at issue were his knee and hand injuries. Medical records provided by Mr. Williams indicated that these injuries were both essentially healed within one month of the accident. Mr. Williams had been released to full

activity by his physician on May 27, 2010. He returned to work without restriction the following month.

With only minimal information available to evaluate Mr. Williams's claim, the defendant initially offered $1,500 to settle the claim. The plaintiff rejected this offer and the defendant repeatedly requested additional information from Mr. Williams's counsel to evaluate the claim. Having received some additional information, the defendant then offered $15,017 to settle the claim which, with the underlying $65,000, brought the value of the claim to over $80,000[2]. Mr. Williams rejected this offer and instead demanded the policy limits claiming to require ongoing medical treatment as a result of the accident. Consequently, the defendant continued to request additional information to evaluate the claim. Despite representations from Mr. Williams's counsel, the record before the court does not demonstrate that any additional information was provided to support the demand of the policy limits.

Upon review, the plaintiffs have not established by clear and convincing evidence that the defendant was motivated by self-interest or ill will in handling Mr. Williams's UIM claim. Instead, it would appear from what has been presented to the court that the instant case simply represents a disagreement

---

[2]The documentation currently before the court demonstrates that Mr. Williams had approximately $46,000 in damages, including expenses and lost wages.

among the parties as to the valuation of the UIM claim[3]. This does not amount to bad faith.

In light of the foregoing, the defendant's motion for partial summary judgment will be granted. An appropriate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date:   December 4, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2014 MEMORANDA\14-1876-01.wpd

---

[3]The plaintiffs argue in their opposing brief that there is a dispute over the value of this case "only because of the Defendant's failure to consider the medical records of Drs. Beth Cohen and Tiffany Griffith . . ." The plaintiffs heavily rely on these records in support of their bad faith claim. The court notes, however, that these records did not come into existence until after the plaintiffs' bad faith claim was filed. In this regard, the plaintiffs' complaint was filed on August 27, 2014. The plaintiff was examined by Dr. Cohen on only one occasion in September 2014, after the plaintiffs' bad faith complaint was filed. The plaintiff was treated by Dr. Griffith on six occasions, October 23, 2014, November 5, 2014, November 12, 2014, November 19, 2014, February 4, 2015, and February 18, 2015, all after the plaintiffs' complaint was filed. It goes without saying that records which did not exist prior to the assertion of the bad faith claim cannot form the basis of the claim.

20